UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOUGLAS HARRIE STEWART,       )
# 799235,                     )
                              )
              Petitioner,     )       Case No. 1:14-cv-586
                              )
v.                            )       Honorable Robert J. Jonker
                              )
CATHLEEN STODDARD,            )
                              )
              Respondent.     )
_____)

## **REPORT AND RECOMMENDATION**

   This is a habeas corpus proceeding brought by a state prisoner pursuant to 28 U.S.C. § 2254.   On March 11, 2011, a St. Joseph County Circuit Court jury convicted petitioner of premeditated first-degree murder in the killing of Venus Stewart, MICH. COMP. LAWS § 750.316(1)(a), and conspiracy to commit first-degree murder, MICH. COMP. LAWS § 750.157a.   On April 18, 2011, the trial court sentenced petitioner to concurrent terms of life imprisonment.

   After unsuccessful attempts to overturn his convictions in Michigan's courts, petitioner filed his federal habeas corpus petition.   He asks this Court to overturn his convictions on grounds rejected by Michigan's courts:

   I.   Petitioner was denied due process and is entitled to a new trial where, following repeated defense objections to discovery violations involving a prosecution expert witness, the parties stipulated that the witness, an FBI electrical engineer and

-1-

forensic examiner, would not testify as an expert, after which the witness provided opinion evidence based on his translations of raw data obtained from a vehicle's global positioning system.

II.    Petitioner was denied a fair trial where the Michigan's courts denied a motion to disqualify the trial court judge after the prosecutor engaged in pretrial *ex parte* communication about the case.

III.    Petitioner was denied a fair trial by the trial court's denial of his motion for a mistrial after the jury heard testimony that petitioner had threatened to go on a rampage.

IV.    Petitioner was denied due process based on prosecutorial misconduct when in his rebuttal argument [the prosecutor] vouched for the credibility and testimony of the lead investigator in the case, prompting a motion for mistrial.

V.    Petitioner was denied due process when the court, at the request of the prosecution, supplemented the standard jury instruction on first-degree murder with an instruction that vouched for the prosecution's view of the evidence.

(ECF No. 1 at PageID.6-14; ECF No. 1-1 at PageID.17-18; *see also* Defendant-Appellant's Brief, ECF No. 7-31, PageID.4265-66).

On December 8, 2014, respondent filed her answer to the petition. Respondent argues that the petition should be denied for lack of merit.   (Answer at 48-88, ECF No. 6, PageID.387-427).   She also argues that petitioner's claim of prosecutorial misconduct in the rebuttal argument[1] is barred by procedural default and that petitioner has not established grounds to overcome that default.   (*Id.* at 4, 73-77, PageID.343, 412-16).

---

[1] This argument is labeled as Ground IV by petitioner (ECF No. 1-1, PageID.18) and as Ground III by respondent.   In order to avoid potential confusion, the numbering provided by petitioner is utilized herein.

Chief District Judge Robert J. Jonker has referred the matter to me for all purposes, including the issuance of a report and recommendation, under 28 U.S.C. § 636(b)(1)(B) and Rule 10 of the Rules Governing Section 2254 Cases in the District Courts.    After review of the state-court record, I conclude petitioner has not established grounds for federal habeas corpus relief.[2]    Accordingly, I recommend that the petition be denied.

## Standard of Review

The Court's review of this petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA).    *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).    AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt."    *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted).    "AEDPA requires heightened respect for state court factual and legal determinations."    *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006).    "State-court factual findings [] are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence."    *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015) (citations and internal quotations omitted).

---

[2] The Supreme Court has indicated that this Court has discretion to ignore a procedural default and proceed directly to the merits of an apparently defaulted claim, when to do so would be more expeditious than an analysis of the complicated procedural default question.    *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). In the present case, the grounds raised by petitioner are meritless, so a detailed analysis of the complicated procedural default issues is unnecessary.

If a state court adjudicated the claim, deferential AEDPA standards must be applied.  28 U.S.C. § 2254(d); *see Premo v. Moore*, 562 U.S. 115, 121 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)).   AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law.   *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  It prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."   *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012) (*per curiam*).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).   "Section 2254(d) reflects that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal."   *Id.* at 102-03 (citation and internal quotation omitted); *see Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015).  Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the

-4-

State court proceeding."    28 U.S.C. § 2254(d); *see White v. Wheeler*, 136 S. Ct. 456, 460 (2015); *Davis v. Ayala*, 135 S. Ct. at 2198; *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).

The only definitive source of clearly established federal law for purposes of § 2254(d)(1) is the holdings – not dicta – of Supreme Court decisions.    *White v. Woodall*, 134 S. Ct. at 1702; *see Woods v. Donald*, 135 S. Ct. at 1377 ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from this Court.).    "[W]here the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."    *Id.*    (quotations and internal citations omitted).

An unreasonable application of the Supreme Court's holding must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)).    Rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."    *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Harrington v. Richter*, 562 U.S. at 103).    "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' " and "[i]t therefore cannot form the basis for habeas relief under AEDPA."    *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir.

2015) (quoting *Parker v. Matthews*, 132 S. Ct. at 2155); *see Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (*per curiam*) ("As we have repeatedly emphasized, [] circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.' ").

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).   Section 2254 (d)(2) requires that this Court accord the state trial court substantial deference.   If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination.   *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015); *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

## Proposed Findings of Fact

### A.    Circuit Court Proceedings

1.    Motion to Disqualify

On September 24, 2010, Circuit Judge Paul Stutesman held a hearing on petitioner's motion to disqualify him.   The motion was based on a brief *ex parte* communication the judge had had with the prosecutor two days earlier, immediately after a conference with the attorneys regarding the upcoming trial in which defense counsel participated by telephone.   (ECF No. 7-4, PageID.649-82).   Judge Stutesman entered his opinion and order denying petitioner's motion.   (ECF No. 7-5, PageID.684-88).   Judge Stutesman described the substance of the September 22, 2010, conference with the attorneys, including an issue that had arisen regarding the

prosecutor's obligation to identify expert witnesses and to provide a summary of their expected testimony.   (*Id.* at PageID.684).   During the conference, Judge Stutesman had rejected the prosecutor's assertion that he did not have to provide this information to defense counsel.   (*Id.* at PageID.684-85).   When the conference had ended, the telephone connection was not severed and the defense attorneys continued to listen in on what was happening in the judge's office where the judge, the court administrator, and the prosecutor were still present.   As the court administrator and prosecutor were exiting, the prosecutor made another reference to providing expert witness names.   Judge Stutesman responded by stating that the prosecutor needed to follow the court rules.   "Prosecutor McDonough then made a statement while exiting, 'Jeff [Schroder] says he isn't going to play dirty pool, but he does' the Court then corrected Mr. McDonnough that all Mr. Schroder was doing was protecting his client's interest and providing a good defense in the case, and that he was a good attorney."   (*Id.* at PageID.685).

Petitioner filed a motion asking that a judge assigned by the state court administrative office review the motion to disqualify.   The state court administrator assigned Paul Hamre, Chief Judge of the Van Buren County Circuit Court.   On October 5, 2010, Chief Judge Hamre denied petitioner's motion to disqualify Judge Stutesman.   (ECF No. 7-6, PageID.689-90).   Chief Judge Hamre found that the Judge Stutesman had not knowingly participated in an *ex parte* communication.   He noted that the vast majority of the conversation related to procedural issues, and that

-7-

judges are allowed to discuss such issues on an *ex parte* basis. He observed that the trial judge made no remarks regarding the prosecutor's comments concerning defense counsel beyond making positive remarks that the defense attorney was doing his job. (*Id.* at PageID.690). The trial judge's comments were not "material in any way or representative of a bias against the [petitioner] or his attorney." (*Id.*). Reviewing the conversation in its entirety, there was no compelling reason to think that this specific situation would have any bearing on the fairness of the judge and the integrity of the trial. (*Id.*).

Petitioner filed an interlocutory application for leave to appeal to the Michigan Court of Appeals. (ECF No. 7-29, PageID.4027-40). On November 24, 2010, the Michigan Court of Appeals denied the application for leave to appeal "for lack of merit in the grounds presented." (*Id.* at PageID.4024).

### 2. Trial and Sentencing

Petitioner's trial began in February of 2011, and it concluded on March 11, 2011, with the jury's verdict finding him guilty of premeditated first-degree murder and conspiracy to commit first-degree murder. (Trial Transcripts (TT1-TT 13), ECF No. 7-14 through 7-26). The following facts were adduced at trial.

In April 2010, Venus Stewart and her two daughters were living in Colon, Michigan, with Venus's parents, Lawrence ("Larry") Macomb and Therese Macomb. Mrs. Macomb last saw her daughter just before leaving for work at 6:00 a.m. on April

26, 2010.   She was at work when she received Mr. Macomb's call advising her that Venus was missing.   (TT2, 196-99, ECF No. 7-15, PageID.2333-36).

Police received a 911 phone call, and Trooper Aaron Steensma was the first police officer to arrive at the Macomb residence.   Mrs. Macomb was crying, hysterical, and she kept repeating, "He took her, he took her, he took her."   Mr. Macomb advised Trooper Steensma that his daughter, Venus Stewart, had been having problems with petitioner, her ex-husband.   (TT1, 138-40, ECF No. 7-14, PageID.2003-05).   Mr. Macomb testified that his daughter had been married to petitioner for about eight years.   She and petitioner moved to Virginia in 2009. Venus moved back into her parents' home in Michigan in February 2010.   (TT2, 196, PageID.2333).   The last time Mr. Macomb had seen Venus had been about 9:00 p.m. on the night of April 25th.   Around 7:45 a.m. to 8:00 a.m. on the morning of April 26th, he woke to the sound of his dog barking out in its pen.   He told the dog to shut up and went back to bed.   About twenty minutes later, his granddaughters were being loud in the front room and awakened him.   He looked around and could not find Venus anywhere in the house.   When he went outside, he saw a neighbor sitting on her porch and asked if she had seen Venus.   When she gave a negative response, Mr. Macomb came home and called 911.   (TT2, 147-57, ECF No. 7-15, PageID.2284-2294).

Mr. Macomb pointed out an area near the propane tank where the rocks had been disturbed, and he noted a tarp wrapper near his pontoon boat he had not seen

the day before.    (TT2, 159-61, PageID.2296-98).    Trooper Steensma put a weight on the tarp wrapper to make sure that it did not blow away.    The trooper went inside the residence and saw a purse in the kitchen.    Venus Stewart's driver's license and bank card were inside the purse.    (TT1, 163-64, 177, ECF No. 7-14,PageID.2028-29, 2042).    The only other people at the residence were Mr. and Mrs. Macomb and their two grandchildren.    (TT1, 181, PageID. 2046).    None of Venus's clothes missing.    Her keys and cell phone were still in the house.    (TT2, 163-64, 208-09, ECF No. 7-15, PageID.2300-01, 2345-46).    Venus Stewart was thirty-two years old and she was described as being a loving mother to her girls.    (TT2, 168-69, 208, PageID.2305-36, 2345; TT3, 36, ECF No. 7-16, PageID.2428; TT4, 117, 144, 154, ECF No. 7-18, PageID.2841, 2868, 2878).

Trooper Steensma contacted central dispatch and requested two canine units for possible tracking of a suspect, an aviation unit for support, Trooper Todd Peterson as a crime scene technician to secure potential evidence, and a marine patrol unit from the St. Joseph County Sheriff's Department (there was a river behind the residence).    (TT1,140-63, ECF No.7-14, PageID.2005-28).

Trooper Peterson collected evidence at the scene.    He took photographs and collected the plastic tarp wrapper with a label indicating that it was "Marketed by Wal-Mart Stores, Incorporated" and "Wal-mart.com."    (TT1, 192-212, PageID.2057-77).    He photographed the area near the propane tank where the gravel appeared to have been disturbed.    He photographed and made casts of tire impressions.    (TT1,

212-18, ECF No. 7-14, PageID.2077-83; TT2, 17-59, ECF No.7-15, PageID.2154-96). Police never found Venus Stewart.

The key testimony against petitioner was provided by his co-conspirator, Richard "Ricky" Spencer.  A forensic examination of petitioner's laptop computer had revealed that it had been used by someone, with a user name of Douglas Stewart, from 12:07 a.m. to about 5:30 a.m. on April 26, 2010.  At about 2:40 a.m., the computer had been used to access a Delaware Technical Community College website. A Delaware Technical Community College e-mail account would have been required to access that account.   A MySpace profile for a "Richard25" had also been reviewed, which would have required knowledge of the account name and password.

At about 5:30 a.m., a non-internet file regarding fertility and mortality rates in China had also been accessed.  (TT8, 108-21, ECF No. 7-21, PageID.3334-47). Ricky Spencer had used petitioner's computer to access those materials while he was staying in petitioner's apartment and pretending to be petitioner.  When he was confronted by the police, Ricky Spencer told them he had agreed to be petitioner's alibi while petitioner went to Michigan to kill Venus Stewart.   (TT5, 27-30, 65, 102, 105, ECF No. 7-18, PageID.2721-24, 2759, 2826, 2829).

Ricky Spencer lived with his parents in Bear, Delaware.   He met petitioner on X-Box live in December 2008.   Spencer described X-Box live as a videogame system that allows you to play games with and communicate with people all around the world.   Ricky Spencer and petitioner became friends.   In June or July 2009,

-11-

petitioner moved from Michigan to Virginia.    (TT4, 21-25, ECF No. 7-17, PageID.2574-78).    Ricky Spencer first met petitioner in person in April 2010. Spencer was then twenty years old and on spring break from school.    He drove from Delaware to Newport News, Virginia, to meet with petitioner, and he stayed with petitioner for over a week.    Petitioner claimed that his wife was physically and mentally hurting their kids.    Petitioner eventually indicated that he was planning to kill his wife and that he wanted Spencer to live in his apartment and pretend to be him.    Petitioner related that he thought that there was a good chance that he would get away with it.    (TT4, 25-39, ECF No. 7-17, PageID.2578-92).

During the course of Spencer's testimony, defense counsel moved for a mistrial based on an argument that Spencer had testified that petitioner had threatened the jury.    (TT4, 44, ECF No. 7-17, PageID.2597).    The testimony at issue is the following:

> Q    What was really important that he had to tell you?
>
> A    He was telling me like, "I talked to my dad already about this an, you know, my wife is physically and mentally hurting my kids. And, you know, if I wasn't – like if I wasn't a hundred percent sure that my kids were going to be injured or, you know, killed by my wife, and if I don't do anything and I find out one day that they're injured or, you know, or dead, that I would go on a rampage.
>
> And it wouldn't be like a rampage killing people, it wouldn't be a, you know, just an instant thing.    He'd plan it out and go after her family and the lawyers and prosecutors and jury until like they stopped and figured out what – what was going on.
>
> And he was telling me that he was going to kill his wife and. . . .

(TT4, 36, ECF No. 7-17, PageID.2589).

Judge Stutesman disagreed with defense counsel's characterization of the above-quoted testimony and denied the motion for a mistrial.   The judge interpreted the statement as being such that, if his wife hurt his children, "he would then go on a rampage against the Prosecutor and the jury that dealt with that issue, not in this case."  (TT4, 45, ECF No. 7-17, PageID.2598).   Judge Stutesman indicated that, if there was any confusion, he would explain to the jury that they were to disregard the statement.   Further, the judge noted that it was not being offered for the truth of the matter as to what petitioner would do, but rather to provide context to the statements that were being made.   (*Id.*).

On April 8, 2010, petitioner once again asked Ricky Spencer to help him kill his wife.   Spencer agreed to be petitioner's alibi because he believed petitioner's claims that his wife was putting their children in danger.   Petitioner explained to Spencer how he planned to put Venus in a choke hold and choke her to death because it was quick and it left little or no evidence behind.   Petitioner demonstrated his proficiency and put Spencer in a choke hold.   Spencer could not scream and was out of breath in mere seconds.   Petitioner explained that he was going to give Ricky Spencer his cell phone, key fob, and credit card to manufacture an electronic record to make it look like he never left Virginia.   Petitioner planned to communicate with Spencer through prepaid cell phones, also referred to as TracFones.   Petitioner explained how on his trip to Michigan he would avoid toll roads and pay for gas with

cash.   He planned to kill Venus at an early time when her parents were out and the children would be at school.   Petitioner even planned out the clothes that he wanted Spencer to wear while he was pretending to be petitioner.   (TT4, 58-63, ECF No. 7-17, PageID.2611-16).

The security cameras from petitioner's apartment and parking garage supplied numerous photos of petitioner and Ricky Spencer during this period.   Spencer testified that he was the skinnier of the two men when they were pictured together. (TT4, 67-88, ECF No. 7-17, PageID.2620-41; TT5, 129-35, ECF No. 7-18, PageID.2853-59). Ricky Spencer briefly went back home to Delaware.   Petitioner called Spencer and asked him to come back to Virginia on Thursday, April 15, 2010. Petitioner had a court hearing in Michigan that Monday in Michigan.   Petitioner gave Spencer his credit card, house key, car key, car clicker, two phones (his cell phone and a prepaid TracFone), a piece of paper, shoes, socks, pants, a "hoodie," a hat that had "U.S. Foodservices" on it, and the key fob used to open the parking garage gate and activate the elevator to get from the parking garage to the lobby.   (TT4 , 94-95, ECF No. 7-17, PageID.2647-48).   The paper provided Richard Spencer with directions regarding what to do at certain times and directions to a Wendy's restaurant near petitioner's residence.   Petitioner knew that this restaurant did not have an outdoor camera and he wanted Ricky Spencer to use his credit card at Wendy's to make it appear as if petitioner was still in Virginia and paying with the card.   (*Id.* at 95, PageID.2648).

Petitioner instructed Spencer that they were to communicate through the prepaid TracFones, so that when police did an investigation, petitioner's cell phone would indicate that it had remained in Virginia.   The jury saw Wal-Mart video recordings of petitioner purchasing TracFones and phone cards on April 14, 2010. (TT7, 21-29, 40-45, ECF No. 7-20, PageID.3068-76, 3087-92).   Petitioner advised Spencer that his car was parked three blocks away from his apartment.   Spencer was to park his car and then drive petitioner's car into the parking garage of petitioner's apartment.   Petitioner indicated that he was going to take care of business in Michigan and Spencer drove off towards Virginia.   (TT4, 95-97, ECF No. 7-17, PageID.2648-50).

Spencer changed into the clothes that petitioner provided and purchased a meal at Wendy's using the credit card.   The purchase appeared on petitioner's account at Langley Federal Credit Union.   Ricky Spencer switched cars, and between 10 p.m. and 11:00 p.m. on April 15, 2010, he parked in the garage of petitioner's apartment building.   Petitioner told Spencer where the security cameras were, and Spencer attempted to conceal his true identity by wearing sunglasses, the hoodie, keeping his head down, and holding his hand near his face.   Petitioner guided Spencer over the telephone as to how to avoid detection by the security cameras as he made his way through the parking garage, parking garage elevator, lobby, interior elevator, and up to petitioner's apartment.   The security camera

photos from the parking garage and apartment were admitted into evidence.   (TT4, 97-120, ECF No. 7-17, PageID.2650-73; TT6, 53-54, ECF No. 7-19, PageID.2992-93).

Once Ricky Spencer was inside the apartment, petitioner instructed Spencer to use the telephone in the apartment to place a call to petitioner's parents.   Spencer followed petitioner's instructions and made it a quick call pretending to be petitioner advising that he was not feeling well and that he would leave for Michigan in the morning after getting a good night's sleep.   Spencer testified that he had a very difficult time getting to sleep.   Petitioner called him between 4:00 a.m. and 6:00 a.m. and indicated that the plan to kill Venus was off because he had been pulled over by an Ohio police officer.   (TT4, 120-25, ECF No. 7-17, PageID.2673-78).

At approximately 4:25 a.m. on the morning of April 16, 2010, Ohio State Police Trooper Jeremy Wheeland pulled over a truck with Virginia license plates registered in the names of Douglas Stewart and Venus Stewart.   Petitioner was driving towards Michigan on I-75, about a half-hour north of Dayton, Ohio.   Trooper Wheeland's traffic stop of petitioner was recorded and that video recording was played for the jury.   Trooper Wheeland identified petitioner as the person he had stopped and the person shown on the recording.   (TT4, 6-15, ECF No. 7-17, PageID.2559-68).

Petitioner instructed Ricky Spencer to mail his cell phone, apartment key fob, etc., to petitioner at his parents' address in Michigan.   Spencer mailed the items as instructed.   He kept the TracFone for future communications.   (TT4, 127-36, ECF

No. 7-17, PageID.2680-89).   Ricky Spencer used his parents' car for his trips between Delaware and Virginia.   (TT3, 105-24, ECF No. 7-16, PageID.2497-2516).   His mother found the United States Postal Service receipt that had been generated when Spencer mailed the items from Newport News, Virginia to petitioner in Michigan. (*Id.* at 115-17, PageID.2507-09).

On April 25, 2010, petitioner and Ricky Spencer agreed to try again. Petitioner called Spencer and indicated that they should meet in Bethesda, Maryland.   Petitioner gave Spencer a pair of pants, a hoodie, and a hat.   He also gave Spencer his car key, car clicker, cell phone, key fob, house key, credit card, and money for gas.   Spencer still had the prepaid phone.   Spencer briefly gave the prepaid phone to petitioner so that petitioner could enter a code and add additional prepaid minutes.   The jury saw the April 25, 2010, Wal-Mart video recording of petitioner purchasing another TracFone and phone cards.   Petitioner also provided Spencer an envelope that Spencer, pretending to be petitioner, would drop off at petitioner's lawyer's office.   Petitioner and Spencer followed the same pattern on parting.   Petitioner indicated that he was headed to Michigan and Spencer headed to Virginia.

Spencer made the purchase at Wendy's and again carried out the switch of vehicles a few blocks from petitioner's Newport News apartment.   He changed into the clothes provided.   This time he did not have to use the fob to enter the parking garage because the gate was broken.   He did not need to use it for the elevator

because a man on the parking garage elevator held the door open for him.   Spencer again tried to conceal his face and the security camera photos of Spencer were admitted into evidence.

Petitioner called an instructed Ricky Spencer to call his boss, pretend to be petitioner, and state that he was sick and would not be at work the next day. Spencer followed the instructions.   Petitioner called Spencer around 7:00 a.m. on April 26, 2010, and asked him to get the telephone number for Venus's parents off his cell phone.   Spencer found the telephone number and relayed it to petitioner. Petitioner instructed Spencer to leave the apartment anywhere from 8 a.m. to 8:15 a.m.   If Spencer did not hear from petitioner by noon, the plan had either backfired or petitioner was on the run.   Spencer was advised that, if he did not hear from petitioner, he should put the items that petitioner had given him into a plastic bag and leave them in the spot where they had met at the Montgomery Shopping Mall in Bethesda, Maryland.   Spencer left the apartment on the morning of April 26, 2010, as instructed.   His testimony was supported by the security camera photographs. (TT5, 9-39, ECF No. 7-18, PageID.2703-33; TT7, 32-40, ECF No. 7-20, PageID.3079-87).

The night transportation supervisor at U.S. Food Services, who had received the phone call on the night of April 25, 2010, indicating that petitioner was sick and would not be at work the next day, testified that the caller did not sound like

-18-

petitioner.    The caller seemed agitated and hurried.    (TT5, 184-87, ECF No. 7-18, PageID.2908-11).

Video surveillance recorded on April 25, 2010, at the Wal-Mart in Van Wert, Ohio showed petitioner entering the store around 6:30 p.m. and leaving the store around 6:45 p.m.    Petitioner purchased a shovel, an "Ozark Trail" 8 foot by 10 foot tarp, gloves and a cap.    The plastic tarp wrapper found outside Venus's parents' home was of a type specifically manufactured for Wal-Mart and sold at Wal-Mart stores.    (TT7, 78-143, 150-62, ECF No. 7-20, PageID.3125-90, 3197-3209).    A latent fingerprint from petitioner's left little finger was found on that plastic tarp wrapper. (TT10, 122-99, ECF No. 7-23, PageID.3627-3704).

A Wal-Mart receipt was found on the floor of petitioner's truck.    (TT10, 77-82, ECF No. 7-23, PageID.3582-87).    A Wal-Mart employee working in asset protection recognized petitioner from his visit to the store on April 25, 2010.    The employee had been looking for shoplifters.    Petitioner's outfit had drawn attention.    Petitioner was wearing a pair of shorts with big Hawaiian flowers that looked like swim trunks, but the shirt that he was wearing did not match the rest of the outfit.    The employee walked past petitioner several times, and on one occasion noted that petitioner was carrying gloves.    (TT7, 144-49, ECF No. 7-20, PageID.3191-96).    Another employee testified that, on April 25, 2010, petitioner had approached her and asked where the tarps were.    She helped petitioner find a tarp in the sporting goods section.    (*Id.* at 149-51, PageID.3196-98).    A third Wal-Mart employee also identified petitioner in

-19-

court and testified that petitioner had been the man in the store on April 25, 2010, wearing the shorts with big blue flowers.  (*Id.* at 152-60, PageID.3199-3207).  A fourth Wal-Mart employee who worked in the store's garden center identified petitioner in court and testified that on April 25, 2010, petitioner had asked her about where he could find lime, a shovel, and duct tape.  (*Id.* at 161-66, PageID.3208-13).

On the morning of April 26, 2010, around 8:30 a.m., petitioner called Ricky Spencer and said, "Okay, dude, it's done."  Spencer asked what had happened. Petitioner explained that he had called Venus's parents' house and said that he was the mailman and that he had a package for Venus.  He had needed someone to open the front gate.  Petitioner was fully covered in dark clothes, and when Venus was close enough, he jumped out.  She only screamed once and tried putting up a fight. He was able to put her in a headlock.  A drop of blood came from Venus's nose. Petitioner advised Spencer that he would call back later because he planned to bury Venus's body.

When petitioner called back, he had not yet disposed of Venus's body because there were people around the original location he had planned to use.  Petitioner instructed Spencer to go to his lawyer's office and drop off the envelope.  He was to hand the envelope to a woman with short black hair, tell that woman that he was petitioner, indicate that he was in a hurry, and tell her to mail him a receipt. Spencer followed the instructions and estimated that he was in the law firm's office for "maybe twenty seconds tops."

Spencer continued to pretend to be petitioner by buying a movie ticket and food at Wendy's with petitioner's credit card.   At around 4 p.m., Spencer received a call from petitioner indicating that it was time for the two of them to get back together in Bethesda, Maryland.   Ricky Spencer gave petitioner back his things in the mall's parking lot.   Petitioner related that he had stopped at a rest stop and taken a shower.   He took someone's license plate and put it on his truck so that he could drive through the tolls.   He threw away his clothes and anything that he had used. Spencer went back home to Delaware.

Petitioner spoke with Spencer afterwards.   Petitioner told him that if the police found out that he had helped petitioner in any way, he could be facing the same charges as petitioner.   (TT5, 39-51, ECF No. 7-18, PageID.2733-45).

The woman at the law firm who had received the envelope from a man claiming to be petitioner on April 26, 2010, testified that she had previously met petitioner three or four times, but could not identify the man that she saw on that date as petitioner.   The man that she saw was wearing a large pair of sunglasses and had a hoodie pulled over his face so that you could only see the mouth/jaw region.   He was of a slighter build, weighing approximately twenty-five pounds less than petitioner. The man had handed her an envelope marked Doug Stewart and it contained a $100 bill inside.   The man told her to mail him a receipt.   (TT5, 195-98, ECF No. 7-18, PageID.2919-22).

Another witness at the law firm noted that the man who came in to make a payment on April 27, 2010, was wearing similar attire, but his behavior and appearance were different.   He took off his sunglasses, was chatty, and chunkier. The witness did not believe that man who showed up on April 27, 2010, was the same man who had been at the office a day earlier.   (TT5, 209-10, ECF No. 7-18, PageID.2933-34).

There was a wealth of electronic evidence supporting Ricky Spencer's testimony.   Extensive records generated from the use of the TracFones showed the time, date, and location of the nearest cell tower when each call had been placed. The computer records documented Ricky Spencer's use of petitioner's computer on the morning Venus disappeared.   There was also GPS data from Ricky Spencer's Tom Tom device.

Michael Fisher, an FBI electronics and forensic examiner, testified on the eighth day of petitioner's trial.   (TT8, 69-86, ECF No. 7-21, PageID.3294-3212).   Mr. Fisher testified that he had used a software program to download data from Ricky Spencer's Tom Tom.   The software took the information from binary code to an easily readable format.   Defense counsel objected and sought to have the evidence excluded.   Judge Stutesman overruled the objection.   Mr. Fisher had not provided expert testimony.   Fisher had not manipulated the data.   The software took the data contained on the device and put it into a form that can be used, much like the ability to print out a digital photo.   (*Id.* at 75-76, 84, PageID.3300-01, 3310).

-22-

In addition to petitioner's fingerprint on the tarp wrapper found at the scene where Venus disappeared, police found tire tracks consistent with having been made by petitioner's truck.   The mixture of DNA found on a pair of sunglasses recovered by the police was consistent with DNA provided by Ricky Spencer and petitioner. (TT 8, 134-50, 207, PageID.3360-76, 3433).

Detective Sergeant Michael Scott testified regarding the extensive investigation that police conducted in an attempt to find Venus Stewart.   Police found no evidence suggesting that Venus was still alive.   (TT12, 5-16, ECF No. 7-25, PageID.3896-3907).

On March 10, 2011, the attorneys delivered their closing arguments.   (TT12, 44-89, ECF No. 7-25, PageID.3935-80).   A few sentences into the prosecutor's closing argument, petitioner's attorney made an objection that the prosecutor was "personally vouching for the evidence."   Judge Stutesman responded by reminding the jurors that the attorneys' arguments were not evidence.   (*Id.* at 44-45, PageID.3935-36).   The prosecutor's closing summarized the evidence that would support a decision finding that the prosecution had carried its burden as to each element of the crimes charged.   He asked the jury to return a verdict finding petitioner guilty of first-degree premeditated murder and conspiracy to commit first-degree premeditated murder.   (*Id.* at 44-58, PageID.3935-49).   Petitioner's attorney's closing included argument that the prosecution had not submitted

sufficient evidence that Venus Stewart was dead.    (*Id.* at 60-61, 78, PageID.3951-52, 3969).

The prosecutor's rebuttal emphasized the absence of any evidence that Venus Stewart was still alive.   He noted that witnesses had described Venus as a doting mother who would never leave her children.   Venus disappeared without taking any personal belongings.   (*Id.* at 80, PageID.3971).   The prosecutor reminded the jury of the evidence that they had heard about the extensive police investigation into Venus's disappearance.   He noted:   "You heard from Detective Scott this morning, who was in charge of this case.   He said there has been no evidence to make him believe that Venus Stewart is alive."   (*Id.* at 85, PageID.3976).

Judge Stutesman denied petitioner's motion for a mistrial, which motion was based on purported vouching for Detective Scott during rebuttal argument.   The prosecutor had not vouched for the credibility of this witness, but merely indicated that Detective Scott had testified that he could find no evidence showing that Venus Stewart was alive.   (*Id.* at 92-97, PageID.3983-88).

Judge Stutesman delivered jury instructions.   (TT12, 29-44, ECF No. 7-25, PageID.3920-35).   Petitioner's objection to the instruction regarding absence of a body was overruled.   Petitioner's attorney had agreed that the instruction that Venus Stewart's body did not need to be recovered if the evidence convinced the jury beyond a reasonable doubt that she was dead was a correct statement of Michigan law.   But he argued that the instruction somehow asked the jury to focus on the one

-24-

piece of evidence that was missing and that it was okay to disregard the absence of evidence regarding Venus Stewart's body.    Judge Stutesman found that the instruction was appropriate in this case because it drew jurors' attention, yet again, to the requirement that the jury base its verdict on the evidence presented and that each element must be proven beyond a reasonable doubt.    (*Id.* at 23-25, PageID.3914-16).

On March 11, 2011, the jury returned its verdict finding petitioner guilty of first-degree premeditated murder and conspiracy to commit first-degree murder. (TT13, 4-7, ECF No. 7-26, PageID.4000-03).

On April 18, 2011, Judge Stutesman conducted a hearing and sentenced petitioner to concurrent terms of life imprisonment without the possibility of parole. (Sentencing Transcript, ECF No. 7-27).

### B.    Subsequent Proceedings

Petitioner's appellate counsel raised the issues now raised in the habeas corpus petition.    (ECF No. 7-31, PageID.4265-66).    On September 11, 2012, the Michigan Court of Appeals rejected petitioner's arguments for lack of merit and affirmed his convictions.    (ECF No. 7-31, PageID.4252-56).

Petitioner sought leave to appeal in Michigan's highest court.    On April 1, 2013, the Michigan Supreme Court denied petitioner's application for leave to appeal because it was not persuaded that the questions presented should be reviewed by the court.    *People v. Stewart*, 828 N.W.2d 52 (Mich. 2013).

-25-

On May 30, 2014, petitioner filed his habeas corpus petition.   (ECF No. 1).

## Discussion

**I      Testimony of Michael Fisher**

In Ground I, petitioner argues that the trial court's decision allowing Michael Fisher's testimony violated his due process rights.   (ECF No. 1 at PageID.6; ECF No. 1-1, PageID.19-24; *see also* Defendant-Appellant's Brief at 14-26, ECF No. 7-31, PageID.4280-92).

It is well-established that this Court may not grant habeas relief on the basis of error in the application of state rules of evidence.   *See Estelle v. McGuire*, 502 U.S. 62 (1991).   An inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."   *Id.* at 67-68.

Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.   State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.   *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Petitioner cannot meet this difficult standard.

The Michigan Court of Appeals rejected petitioner's claim that the admission of Michael Fisher's testimony violated his due process rights for lack of merit (ECF No. 7-31, PageID.4252-53) and that decision is entitled to AEDPA deference. 28 U.S.C. § 2254(d). Michael Fisher testified that he obtained data from Ricky Spencer's Tom Tom GPS unit and that he used software to translate the data into a readable format. His "translations" were admitted into evidence as exhibits 174 and 175. Pursuant to the prosecutor's stipulation, Mr. Fisher was not qualified as an expert witness. Thus, the issue was whether Mr. Fisher provided expert testimony. The Michigan Court of Appeals noted that the distinction between lay and expert testimony was that "lay testimony result[s] from a process of reasoning familiar in everyday life" and expert testimony results from "a process which can be mastered only by specialists in the field." (ECF No. 7-31 at PageID.4253). Expert testimony concerns matters that are not within the knowledge of a lay person.

Mr. Fisher testified that the data stored in the GPS unit was in binary code, which is not readable by him or others, and that exhibits 174 and 175 were a "translation" of the actual data stored inside the GPS unit performed by software programs designed for that purpose. The Michigan Court of Appeals concluded:

> Fisher's testimony [did] not suggest that Fisher himself translated or interpreted the data that was stored inside the GPS unit nor that getting the software programs to run required any specialized knowledge or training. Thus, the trial court did not err in allowing him to offer lay testimony. Defense counsel still had the opportunity to cross-examine Fisher on his apparent lack of knowledge as to how the software actually worked and, could perhaps have challenged admission of the results of the software process as unreliable and lacking in foundation, but elected

not to do so.    Therefore admission of exhibits 174 and 175 into evidence was not error.

(*Id.*).

The Michigan Court of Appeals noted that, even if it had concluded that Mr. Fisher provided expert testimony, the error was harmless given that Ricky Spencer's testimony was corroborated by "numerous witnesses, including that of Spencer's parents, an Ohio state trooper, employees of the law firm of Wilson & Wilson, a computer forensic examiner, as well as [petitioner's] bank records and the telephone records of three TracFones[.]"    (*Id.*).

Petitioner has not addressed, much less carried his burden under 28 U.S.C. § 2254(d).    I find that Ground I does not provide a basis for habeas corpus relief.

## II.    Motion to Disqualify

In Ground II, petitioner argues that he was denied a fair trial where the court denied a motion to disqualify Judge Stutesman after the prosecutor engaged in a pretrial *ex parte* communication about the case.    (ECF No. 1 at PageID.7; ECF No. 1-1, at PageID.25-26*; see also* Defendant-Appellant's Brief at 27-31, ECF No. 7-31, PageID.4293-97).

[D]ue process demands that the judge be unbiased.    *In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases."). Furthermore, a judge can and should be disqualified for "bias, [ ] a likelihood of bias[,] or [even] an appearance of bias."    *See Ungar v. Sarafite*, 376 U.S. 575, 588 (1964);

-28-

*see also Murchison*, 349 U.S. at 136 ("[O]ur system of law has always endeavored to prevent even the probability of unfairness."); *accord Anderson v. Sheppard*, 856 F.2d 741, 746 (6th Cir. 1988) (opining that due process "require[s] not only an absence of actual bias, but an absence of even the appearance of judicial bias").

Nevertheless, not all appearances of bias are of constitutional significance; indeed, "most matters relating to judicial disqualification d[o] not rise to a constitutional level." *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 702 (1948) (citing *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)) ("All questions of judicial qualification may not involve constitutional validity."); *see also Bracy v. Gramley*, 520 U.S. 899, 904 (1997) ("Of course, most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause ... establishes a constitutional floor, not a uniform standard. Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar.") (citation omitted).

In only three types of cases has the Supreme Court actually held that something less than actual bias violates constitutional due process: (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey*, 273 U.S. at 523 (subsequently expanded to include even indirect pecuniary interest); and (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the contemnor," *Murchison*, 349 U.S. at 141 (subsequently clarified to involve cases in which the judge suffers a severe

-29-

personal insult or attack from the contemnor); and (3) when, "based on objective and reasonable perceptions, ... a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent," *Caperton v A.T. Massey Coal Co.*, 556 U.S. 868, 884 (2009).

The Michigan Court of Appeals denied petitioner's interlocutory application leave to appeal "for lack of merit in the grounds presented" (ECF No. 7-29 at PageID.4024) and, given the absence of any change in the law or the facts, it declined to revisit the issue when petitioner raised the issue again on direct appeal.   (ECF No. 7-31, PageID.4253-54).   The decision of the Court of Appeals rejecting Ground II for lack of merit is entitled to AEDPA deference.   28 U.S.C. § 2254(d).

Petitioner has not addressed, much less carried his burden under 28 U.S.C. § 2254(d).   I find that Ground II does not provide a basis for habeas corpus relief.

## III.    Motion for Mistrial

In Ground III, petitioner states that he was deprived of a fair trial when the trial court denied his motion for a mistrial based on Ricky Spencer's testimony that petitioner indicated that he would go on a rampage.[3]   (ECF No. 1 at PageID.9; ECF

---

[3] The document that plaintiff labeled as an attachment to his petition (ECF No. 1-1, PageID.15-31) contains no argument regarding Ground III.   It is indulgently addressed herein because the issue was listed in the attachment (*Id.* at PageID.18) and the petition itself provides a clear indication that Ground III is the third issue that petitioner raised on direct appeal (ECF No. 1 at PageID.9).

No. 1-1 at PageID.18; *see also* Defendant-Appellant's Brief at 32-34, ECF No. 7-31, PageID.4298-4300).

The Michigan Court of Appeals found "no merit" in petitioner's argument that Spencer's testimony about petitioner's statement that he was going on a rampage was not relevant and unfairly prejudicial and therefore should not have been admitted. (ECF No. 7-31 at PageID.4254).    The Court of Appeals found that the danger that the jury would unfairly infer a threat directed at them was "slight or nonexistent." (*Id.*).    Moreover, to the extent that the testimony was subject to confusion, the trial court offered to provide a cautionary instruction, which [petitioner] declined."    (*Id.*). There was "no danger that the jury would give undue or preemptive weight to [petitioner's] statement."    (*Id.*).

The trial court's decision denying petitioner's motion for a mistrial was not an abuse of discretion.    (*Id.*).    The factual findings of the Michigan Court of Appeals are entitled to a presumption of correctness under 28 U.S.C. §2254(e)(1) and petitioner had the burden of rebutting the presumption by clear and convincing evidence.    Petitioner did not address or carry his burden.

Further, petitioner has not addressed, much less carried, his burden under 28 U.S.C. § 2254(d).    I find that Ground III does not provide a basis for habeas corpus relief.

## IV.    Prosecutorial Misconduct

Ground IV is petitioner's argument that he was denied due process based on prosecutorial misconduct when in his rebuttal argument the prosecutor purportedly vouched for the credibility and testimony of the lead investigator in the case, prompting a motion for mistrial.    (ECF No. 1 at PageID.9; ECF No. 1-1 at PageID.27-29; *see also* Defendant-Appellant's Brief at 35-38, ECF No. 7-31, PageID.4301-04).

The scope of review in a habeas action regarding allegations of prosecutorial misconduct is narrow.    "Petitioner's burden on habeas review is quite a substantial one."    *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).    This court does "not possess supervisory powers over state court trials."    *Id.*    "It is the responsibility of the state courts to police their prosecutors; [this court has] no such authority."    *Id.* "Therefore, on habeas review, our standard is limited to 'the narrow one of due process.'"    *Id.*    (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (" '[T]he appropriate standard of review for ...a claim [of prosecutorial misconduct] on a [petition for a] writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.' ") (quoting *Darden*, 477 U.S. at 181).    To be grounds for habeas corpus relief, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."    *Darden*, 477 U.S. at 181; *see Parker v. Matthews*, 567 U.S. 37, 45 (2012); *Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012).

-32-

Because the Michigan Court of Appeals rejected petitioner's claims for lack of merit, petitioner faces a significant additional hurdle.    He must demonstrate either that the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or that it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."    28 U.S.C. § 2254(d).

The federal courts have generally recognized two types of objectionable vouching.    *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see Wogenstahl v. Mitchell*, 668 F.3d at 328 (treating the two aspects of vouching as part of a single standard).    The first type impermissibly places the government's prestige behind the witness to bolster the witness's credibility. Francis, 170 F.3d at 550.    In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt.    *Id.* at 551.    Neither type is at issue here.

Moreover, the Supreme Court has never recognized "vouching" as a constitutional-level claim.    "There is no 'clearly established Federal law, as determined by the Supreme Court of the United States' against 'vouching.' "    *Vance*

-33-

*v. Berghuis*, No. 1:09-cv-137, 2013 WL 3161326, at \*23 (W.D. Mich. June 20, 2013)

(quoting 28 U.S.C. § 2254(d)(1) and citing *Parker v. Matthews*, 567 U.S. at 47-48).

The Michigan Court of Appeals found no prosecutorial misconduct.    Petitioner

was not deprived of a fair trial.    The prosecutor was free to argue the evidence and

the reasonable inferences that arose from it.    "The prosecutor's argument was

merely a restatement of Detective Scott's testimony that there was no evidence to

suggest that Venus was alive."    (ECF No. 7-31 at PageID.4255).    The Michigan

Court of Appeals' decision easily withstands habeas corpus review under applicable

standards.    28 U.S.C. § 2254(d).

## V.    Jury Instructions

Ground V is petitioner's argument that he was denied due process when the

court, at the request of the prosecution, supplemented the standard jury instruction

on first-degree murder with an instruction that vouched for the prosecution's view of

the evidence.    (ECF No. 1 at PageID.10;  ECF No. 1-1 at PageID.30; *see also*

Defendant-Appellant's Brief at 39-41, ECF No. 7-31, PageID.4305-07).

There is no general federal right to a properly instructed jury.    With few

exceptions, the substance of jury instructions are a matter of state law.    *See Estelle*

*v. McGuire*, 502 U.S. 62, 70-72 (1991).    Consequently, a federal court may grant

habeas corpus relief based on errors in state jury instructions only in "extraordinary

cases."    *Daniels v. Lafler*, 501 F.3d 735, 741 (6th Cir. 2007) (citing *Lewis v. Jeffers*,

497 U.S. 764, 780 (1990)).    A habeas court may not grant relief on the basis of an

allegedly erroneous instruction on evidence merely because it disagrees with the instruction.   The only question in habeas corpus is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *accord Waddington v. Sarausad*, 555 U.S. 179, 191 (2009).

"It must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some constitutional right."   *Estelle*, 502 U.S. at 72 (quotations and citation omitted).   "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."   *Id.* (quoting *Cupp v. Naughten*, 414 U.S. at 147).

Petitioner "concede[d], the supplemental instruction was an accurate statement of the law.   A victim's body is not always necessary to establish the corpus delecti of homicide."   (ECF No. 7-31 at PageID.4255).   Petitioner offered no argument that the supplemental instruction did not apply to the facts of the case. (*Id.*).   The Michigan Court of Appeals rejected petitioner's argument that the supplemental instruction encouraged the jury to disregard the fact that the prosecutor failed to present proof of Venus Stewart's death:

> The supplemental instruction drew the jury's attention to the fact that Venus's body was not found; however, the supplemental instruction did not lessen the prosecutor's burden of proof or encourage the jury to disregard the lack of a body.   The supplemental instruction, while stating that Venus's body need not be recovered, reiterated that the prosecutor was required to prove beyond a reasonable doubt that Venus

was dead.    Thus, when the instructions for first-degree premeditated murder are read in the entirety, the instructions required the jury to find beyond a reasonable doubt that Venus was dead, regardless of whether her body was recovered, and that she died as a result of an act of defendant.    Because the supplemental instruction accurately stated the law, was applied, and did not lessen the prosecutor's burden of proving that Venus was dead as a result of an act of defendant, we conclude there was no instructional error.

(ECF No. 7-31 at PageID.4254-56).

Petitioner has not addressed, much less carried his burden under 28 U.S.C. § 2254(d).    I find that Ground V does not provide a basis for habeas corpus relief.

## VI.    Certificate of Appealability

Even though I have concluded that petitioner's habeas petition should be denied, under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted.    A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).    The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.    *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).    Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.    *Id.* at 467.

I have examined each of petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).    Under Slack, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*    "A petitioner satisfies this standard by demonstrating

that … jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could not conclude that this Court's denial of petitioner's claims would be debatable or wrong.   Accordingly, I recommend that a certificate of appealability should be denied.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied on its merits.   I further recommend that a certificate of appealability be denied.

Dated: December 21, 2017            /s/   Phillip J. Green
                                    PHILLIP J. GREEN
                                    United States Magistrate Judge

### NOTICE TO PARTIES

ANY OBJECTIONS to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.   28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).   All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).   Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).   General objections do not suffice. *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).